[No. 4070.]
SATERLEE V. SATERLEE.

1.  DIVORCE—PRACTICE—CROSS-COMPLAINT—VERDICT—INSTRUCTIONS.

In an action for divorce where the defendant by cross-complaint sets up affirmative grounds for divorce against plaintiff, and the jury returns a verdict upon the complaint, without making any findings upon the cross-complaint, it is the duty of the court to direct the jury to find a verdict upon the cross-complaint.

2.  PRACTICE—VERDICT—SPECIAL FINDINGS.

A jury may change its verdict or special findings at any time before they are received by the court and before the jury has separated.

3.  DIVORCE—EXTREME CRUELTY—CHARGE OF INFIDELITY.

A charge of infidelity by a wife against her husband becomes an act of cruelty only when wantonly or maliciously made. Such accusations, though untrue, if not made through hatred or ill-will, but in good faith and for the purpose of inducing the husband to observe his marital duties are not grounds for divorce.

4.  DIVORCE—CRUELTY—FAILURE OF WIFE TO CONVERSE WITH HUSBAND.

An action for divorce by a husband against his wife on the grounds of cruelty is not sustained by evidence of a failure of conversation between them where it does not appear that the failure to carry on conversation was due to a neglect of duty on the part of the wife, but might have been wholly due to the husband's neglect of duty.

5.  DIVORCE—DUTY OF COURT.

In an action for divorce if facts are developed at the trial which make it inequitable or unjust for a divorce to be granted, the court must see to it that a decree is not granted.

6.  DIVORCE—CRUELTY—ATTEMPT TO KILL—EVIDENCE.

In an action for divorce by a husband against his wife, a charge in the complaint that defendant attempted to kill plaintiff is not supported by the evidence of plaintiff that defendant put a drug in his coffee the nature of which he could not give, and the evidence of another witness that defendant had stated that she had given him a dose and intended to break him from drinking in that way.

7.  DIVORCE—CRUELTY—EVIDENCE.

Repeated urging of the husband by the wife to insure his life for her benefit cannot be considered as an act of cruelty and is not a ground for divorce.

*Appeal from the County Court of Montezuma County.*

This is an action for divorce. The parties were married February 14, 1886, at Durango. The case was tried in June, 1899. The complaint charged the defendant with extreme cruelty, in these words: "That, since their said marriage, defendant has been guilty of extreme cruelty toward the plaintiff in this, to-wit: That defendant repeatedly threatened to kill this plaintiff on different occasions, and would accuse this plaintiff of being criminally intimate with other women, of which he was wholly innocent, and on one occasion in the year 1896, put a drug in this plaintiff's coffee, the exact nature of which this plaintiff is unable to give, but this plaintiff believes that said drug was placed in the said coffee in furtherance of her threat or threats many times made, that she would kill him. That defendant repeatedly urged this plaintiff to have his life insured, and offered on different occasions to pay the premium for the same herself if he would have his life insured in her favor, until finally plaintiff, fearing for his life, was forced to leave her, which he did for these causes, and no other."

The answer of the defendant denies specifically the charges of cruelty, and by way of recrimination alleges desertion and non-support; and prays that plaintiff be denied a divorce.

The testimony for the plaintiff was, in substance, as follows:

The plaintiff testified: "We lived together up to about nine years ago. Nine years ago this spring her brother, Mike Dooley, came out to this country and about six or seven months from that time our trouble commenced. Trouble kept going on, and we had quite a little trouble then; in fact, I left the place, and through promises and one thing another she got me to come back. That was in 1890. I was away, I think, about two weeks; she promised me that

she would behave herself and not be nagging me and making life miserable for me. After a while it commenced again, and she accused me of being intimate with other women and made the remark that there would be killing if she found out it was so—if she was satisfied that it was so in regard to other women. We lived at Cortez at that time; then we went to Mancos and again trouble commenced, and life for the last two or three years there has been so that about half of the time there was no conversation between us, sometimes two or three weeks not spoken a word, and finally I was not there long before she wanted me to get my life insured, and I did not care to have my life insured. Our relations at that time were only by spells agreeable. Then she kept at me several times to have my life insured, and I kept making excuses. She said, 'If you will get your life insured, I will pay the premium myself;' and by the way things were going, I did not care to, and I did not feel any too safe about it, I told her. She said nothing; was insulted. Then along later I became afraid, and I told her I did not see why she was so anxious to have my life insured. We had not spoken any for two weeks, and one morning I sat at the breakfast table, and there was three cups and saucers set at my right hand, and I passed one over to Mike Dooley, she picked up the other cup, put in sugar and cream, and went to the pantry; I did not notice what she was doing with the cup, and when she came back she said, 'This is for you.' I said I did not see what difference it makes; and I could not understand what difference it made which cup I used. I thought I would not drink that. I ate my breakfast, and before we got through I had not stirred it up any; I took a teaspoonful of the coffee and I could not taste anything but it burned as far as it went; and I went to the water pail and took a drink of water, and that seemed to kindle the fire. And she spoke up and said, 'What is the matter with the coffee?' and she turned to Mike Dooley and said, 'Do you

see anything wrong with the coffee?' and he said, 'I cannot taste anything.' And from that time I would not taste anything until I saw that they had tasted it. I was in absolute fear of my life. This was in January, 1898, and I remained with her after that a little over a month.

"The way the trouble came about, I saw very quickly after Mike Dooley got here there seemed to be a change some way, and the two of them started in against me and made it so disagreeable until I did not spend but very little of my time at home. Her very acts just seemed to show that I was there merely as a tool; it was not very much that she would say, but act something else all the while. The scolding commenced along about 1891 or 1892, and that was the first time that she accused me of being intimate with other women; there was no truth in that whatever. Her conduct was such that I could spend but very little of my time at home; I would go up town and spend my evenings, and that continued the entire time until I left her. The effect of her conduct on me was that there was not any enjoyment in life for me. I did not care to spend much time around home; once in awhile I would take a streak to stay around home but generally staid somewhere else, it was so disagreeable, staid up town until bed-time."

*Cross Examination·*

"Mrs. Saterlee was industrious and saving, she did sewing and washing for men here to help make a living; she has always been a good worker. I have been a drinking man for the last few years, I drank once in awhile before we were married; about eleven or twelve years ago, when we came here, I began drinking more. I had been drunk previous to that. I do not remember the first time I came home under the influence of liquor. The Christmas after we were married, I was pretty well filled up; I do not remember whether I had come home previous to that under the influence of

liquor. I have since. I generally took one drink before breakfast, one before dinner, and sometimes one before supper, but hardly ever after supper. The habit of drinking grew on me; the trouble I had at home naturally drove me to drinking.

"Q. Did you have to take the Keeley cure?

"A. Yes.

"What particular way did you expect them to do away with you?

"A. With a drug.

"Q. What made you think it would be a drug?

"A. Because I knew it would be. I did not expect them to come out and shoot me. I expected I would not live very long after I got my life insured.

"I did not get my life insured. She had lots of medicine coming through the mail, and I did not understand what it was."

John White, a witness for the plaintiff, testified:

"Mrs. Saterlee made a statement to me in the presence of my wife; she said that she had given him a dose. I paid so little attention to what she said that I do not remember all. She stated that she was going to break him from drinking, in that way, and that she had dosed him. I remarked, 'Are you not afraid you will kill him?' and she said, 'No.' She did not say what she gave him, but she tried to make him sick."

*Cross Examination:*

"When I first knew Saterlee, he frequently took a drink but I did not see him under the influence of liquor; I have seen him under the influence of liquor since then very often. I do not remember but once when he could not control himself. He was what I would call an habitual drinker. The year that Mr. Saterlee lived at Cortez, I did not know very much of them; after he came to Mancos, I tried to use my influence to keep him from drinking, perhaps for a month at

a time he would not take a drink. He was a steady drinker but he was a peculiar man. He would take a drink but it would not keep him from his business."

The jury was instructed, given a number of interrogatories to be answered and two blank verdicts,—one for a finding upon the complaint and the other for a finding upon the cross-complaint. It afterwards came into court with a verdict upon the complaint and answers to the interrogatories, but with no verdict upon the cross-complaint. These the court refused to receive, and directed the jury to· retire. Afterwards, the jury returned a verdict finding the defendant guilty of the matters charged in the complaint and the plaintiff not guilty of the matters charged in the cross-complaint; and, by its special findings, that the defendant was guilty of certain specific acts of cruelty, that she had no means of earning a living, and that she was not in good health. After the jury had retired to consider· the cross-complaint, it changed its answer to one of the interrogatories. The court rendered judgment upon the verdicts and refused to award the defendant alimony. From this judgment the defendant appeals to this court.

Mr. J. B. MELVILLE for appellant.

Mr. N. C. MILLER for appellee.

Mr. JUSTICE STEELE delivered the opinion of the court.

The principal errors assigned and argued are: First, that the verdict and special findings, as first presented, should have been received by the court; and that the court erred in permitting the jury to change the special findings when once completed. Second, that the court erred in entering a decree for plaintiff finding the defendant guilty of extreme cruelty. Third, that the court erred in refusing the defendant alimony.

It was the duty of the court to direct the jury, it not having separated, to return a verdict upon the cross-complaint; and the jury was at liberty to change its verdict or special findings at any time before they were received by the court and before it had separated. *Ward v. Ward*, 25 Colo. 33.

The instructions given by the court were full, fair, and impartial, and were more carefully considered than is usual in a divorce suit. No error is assigned concerning them; and the learned judge who prepared them is to be commended. But, upon a careful review of all the testimony in the case, we are of opinion that the plaintiff was not entitled to a decree. He alleged, in substance, that his wife threatened, and attempted, to take his life, and that she charged him with being criminally intimate with other women. The charge of threatening to take his life failed utterly. Giving to the statement made by the wife concerning the husband's infidelity the strongest construction against her, it was a mere intimation, and was not uttered in anger nor under circumstances tending to injure the sensibilities of her husband. To charge a husband with infidelity, becomes an act of cruelty only when wantonly or maliciously made. Such accusations, though they may not be true, if not made through hatred or ill-will, but in good faith and for the purpose of inducing the husband to observe his marital duties, are not grounds for divorce. A wife has the right, and it is her duty, to call her husband's attention to what she may have heard affecting his conduct; it is his duty, if not guilty, to endeavor to convince her of his innocence. The plaintiff testified that, "For the last two or three years, about half the time there was no conversation between us,—sometimes two or three weeks not a word spoken." It does not appear that the wife failed in her duty in this regard. For aught that appears in the record, the failure to carry on conversation was due wholly to the husband's neglect of duty. But, even if she had failed to speak to her husband for a week or two at

a time, the record shows and the plaintiff admits, that he took the Keeley cure because he "had to," and that he was very drunk on several occasions, and that he was in the habit of drinking and staying away from home until bed-time because of the conduct of his wife. The plaintiff's witness, White, said that plaintiff was an habitual drinker, and that he induced him to take the Keeley cure because plaintiff was injuring his health. A married man who, for ten years of his life, has indulged in the habit of drinking and of coming home at bed-time in a condition incident to the degree of inebriety varying from the garrulous exhilaration of one only partially intoxicated to the sullenness of a sot, cannot expect his wife to show that affectionate regard for him which is his due under other circumstances, and cannot complain if she does not engage in conversation which she knows will terminate in a quarrel. Sensuality and drunkenness are accompanying vices; and an intimation such as the defendant is said to have made is not cruelty in any event, and it is surely not cruelty to intimate that a drunken husband is also sensual.

If facts are developed at the trial which make it inequitable or unjust for a divorce to be granted, the court must see to it that a decree is not granted. *Ward v. Ward*, 25 Colo. 33.

The plaintiff alleges that the defendant, on one occasion, drugged his coffee; and the jury found that fact, in its special findings, as one of the acts of cruelty. The act complained of did not appear to the defendant as of great consequence, because he lived with his wife a month afterwards, although he says he watched her after that. A witness called by the plaintiff said that defendant declared she had given "a dose" to her husband to break him of the drinking habit. In this light, the conduct of the defendant appears to be perfectly consistent with an innocent intent. One act of this character is not sufficient to entitle a party

to a divorce; though one act of extreme cruelty will author-
ize a divorce, the statute requires that there shall be repeated
acts of cruelty, and it means a continued ill-treatment. Of
course if it had been established that the wife undertook to
take her husband's life by poisoning, that would be another
case and sufficient ground for a divorce; but the testimony
wholly fails to support any such contention.

Urging the husband to insure his life for her benefit is
not a ground for divorce, and cannot be considered an act of
cruelty.

For the reasons herein given, and because the testimony
does not support the verdict, the judgment is reversed, with
directions to enter an order of dismissal.

*Reversed.*